728 F.Supp. 298 (1990)
ARGONAUT INSURANCE COMPANY, INC., Plaintiff,
v.
U.S. FIRE INSURANCE COMPANY, Defendant.
No. 86 Civ. 0357 (RWS).
United States District Court, S.D. New York.
January 16, 1990.
Garcia, Stallone, Gass & Caliendo, Melville, N.Y. (Joseph F. Garcia, Richard T. Lau, of counsel), for plaintiff.
Anthony J. McNulty, New York City, for defendant.

*299 OPINION
SWEET, District Judge.
This coverage dispute between Argonaut Insurance Company, Inc. ("Argonaut") and U.S. Fire Insurance Company ("U.S. Fire") was argued before the court following the parties' submission in lieu of trial of an agreed statement of facts. Based on the findings and conclusions set forth below, judgment will be entered directing dismissal of Argonaut's complaint against U.S. Fire.

Prior Proceedings
This is one of three related proceedings initiated in 1986 to resolve several coverage disputes arising between Argonaut, U.S. Fire, and Hartford Indemnity Insurance Co. ("Hartford") with respect to insurance carried by Mount Sinai Hospitals ("Mount Sinai"). By order of the court dated July 15, 1986, Samuel Cantor, Esq. was appointed as Special Master to oversee discovery and to consider and make recommendations with respect to certain dispositive motions made by Argonaut and U.S. Fire in these proceedings.
On July 8, 1987, the Special Master issued a report recommending denial of these parties' motions. The court, by opinion of December 11, 1987, considered the objections to the report and determined that the motions should be denied. Following additional discovery and further motion practice, which did not result in the disposition of these actions, the proceedings were scheduled for a final pre-trial conference on April 4, 1989.
On that occasion, the two other actions (86 Civ. 0358 and 86 Civ. 1232) and the claims brought against Hartford in this action (86 Civ. 0357) were discontinued with prejudice by stipulation and order. The stipulation left only the claim of Argonaut against U.S. Fire in 86 Civ. 0357, which those two parties agreed to submit to resolution on an agreed statement of facts. After several extensions of time, a statement of agreed facts was submitted to the court on August 4, 1989. Following receipt of the parties' memoranda of law and upon oral argument thereon, the matter was taken under submission on August 18, 1989.

The Facts
The following findings of fact are not in dispute. In 1982 a medical malpractice case was brought against Mount Sinai (Bilbraut v. Mount Sinai Hospital, 82 Civ. 6234), which arose from events occurring on March 2, 1971. Bilbraut ended in a structured settlement reached at formal conference on April 17, 1985, calling for the payment of $918,916 to the Bilbraut plaintiff.
At the time of the occurrence, Hartford was the primary carrier for Mount Sinai, having issued a primary medical malpractice policy to the Federation of Jewish Philanthropies ("FOJP"), of which Mount Sinai is a member. Hartford paid $50,000 of the settlement sum.[1]
Argonaut, an excess carrier for Mount Sinai, paid the remaining amount of $868,916, reserving its rights against Hartford and U.S. Fire. Its malpractice liability policy for the relevant period contained limits of liability of $1 million per occurrence, in excess of a $50,000 deductible. This policy, first reported in 1974, was a "drop back" policy covering claims made from 1974 forward that arose from events occurring between July 1, 1969 and July 1, 1971. The annual premium paid by the insured for this coverage, which extended not only to the Mount Sinai facility but other FOJP facility locations, was $213,500.
U.S. Fire, which also was an excess carrier to Mount Sinai, declined to pay any portion of the Bilbraut settlement. Its "comprehensive catastrophe liability" policy in effect at the time of the event in *300 question had a liability limitation of $10 million dollars for liability in excess of $500,000 per occurrence. In a schedule appended to the U.S. Fire policy at the time of issuance, Hartford was identified as the primary carrier for Mount Sinai. The schedule further stated that Hartford's limits of liability were $500,000 per occurrence. The annual premium paid by Mount Sinai on this U.S. Fire catastrophe policy was $75,900.
Both the U.S. Fire and Argonaut policies contained "other insurance" clauses. The clause in the U.S. Fire policy provides in pertinent part as follows:
If other collectible insurance with any other insurer is available to the insured covering a loss also covered hereunder (except insurance purchased to apply in excess of the sum of the retained limit and the limit of liability hereunder) the insurance hereunder shall be in excess of, and not contribute with, such other insurance.
The Argonaut "other insurance" clause states:
This insurance does not cover any liability which is insured or would, but for the existence of this insurance, be insured by any other insurance, except in respect of any excess beyond the amount which would have been payable under such other insurance had this insurance not been effected.

The Issue
At issue is whether U.S. Fire is obligated to Argonaut for some portion of the Bilbraut settlement. U.S. Fire contends that it is not obligated to contribute because its catastrophe policy is excess not only to the Hartford primary insurance policy but also to Argonaut's policy. Argonaut, on the other hand, contends that either (a) its own policy is excess to the policy of U.S. Fire after the first $500,000 in payments (in which case U.S. Fire is obligated to reimburse it for the entire amount of the settlement in excess of that sum) or (b) the policies provide concurrent excess insurance, entitling Argonaut to pro rata contribution from U.S. Fire of 10/11ths of the amount of the settlement over $500,000, based on the respective liability limits of the two policies ($1 million and $10 million).
The case thus requires that the court consider the "pecking order among multiple insurers covering the same risk," a quandary which all too frequently arises from the fact that "each attempts by specific limitations upon the rights of its insured to distance itself further from the obligation to pay than have the others." State Farm Fire & Casualty Co. v. LiMauro, 65 N.Y.2d 369, 372, 492 N.Y.S.2d 534, 537, 482 N.E.2d 13, 16 (1985) ("LiMauro"). The court's consideration of the proper "pecking order" in this diversity action is governed by the law of New York, as it is the jurisdiction in which the insurance contracts apparently were made, in which the underlying incident arose, and the legal authority of which both parties principally have relied upon in their briefs.

Excess Coverage Contribution
In New York when each of two or more policies covering the risk "generally purports to be excess to the other, the excess coverage clauses are held to cancel out each other and each insurer contributes in proportion to its limit amount of the insurance...." Lumbermens Mutual Casualty Co. v. Allstate Insurance Co., 51 N.Y.2d 651, 655, 435 N.Y.S.2d 953, 955, 417 N.E.2d 66, 68 (1980) ("Lumbermens"), quoted in U.S. Fire Insurance Co. v. Federal Insurance Co., 858 F.2d 882, 885 (2d Cir.1988) cert. denied, ___ U.S. ___, 109 S.Ct. 1744, 104 L.Ed.2d 181 (1989); accord LiMauro, 65 N.Y.2d at 373-74, 492 N.Y. S.2d at 538, 482 N.E.2d at 17. This rule is, however, inapplicable
when its use would distort the meaning of the terms of the policies involved. Whether there will be such distortion turns on consideration of the purpose each policy was intended to serve as evidenced by both its stated coverage and the premium paid for it, as well as upon the wording of its provisions concerning excess insurance.
LiMauro, 65 N.Y.2d at 374, 492 N.Y.S.2d at 538, 482 N.E.2d at 17 (citations omitted); see also U.S. Fire, 858 F.2d at 885.
*301 Applying the foregoing considerations in the LiMauro and Lumbermens cases, the Court of Appeals of New York on each occasion determined that the several policies before it, although superficially similar to the extent each contained an "other insurance" clause construing itself as excess coverage, in fact could be placed in a pecking order indicated by the "catastrophe" or "umbrella" nature of the protection that was intended to be provided in certain policies, which rendered those policies to be "truly excess" to other nonprimary coverage. See LiMauro, 65 N.Y.2d at 376-379, 492 N.Y.S.2d at 539-541, 482 N.E.2d at 18-20; Lumbermens, 51 N.Y.2d at 654-657, 435 N.Y.S.2d at 955-956, 417 N.E.2d at 67-68. That would appear to be true of the policies in issue here as well.
There is no question that the Hartford policy was issued to provide the first layer of coverage for the event underlying the Bilbraut liability, and that the Argonaut and U.S. Fire policies are to that extent both excess to it. But the latter policies are "excess" to Hartford in two rather distinct ways. The purpose of the Argonaut "drop back" policy (reported years after the event in question but before the lawsuit), as evidenced by its stated coverage, was to stand in for prior issued policies which "denie[d] coverage because of the existence therein of a `discovery period' condition because of elapsed time...." In other words, this policy appears to have been purchased to provide an alternative, but essentially primary, layer of coveragebeginning from the $50,000 "deductible" up to $1,000,000 per occurrence  protecting the insured against liability for those malpractice events which occurred in the period from July 1969 to July 1971 but upon which claims might be made so late as to jeopardize the original layer of policy coverage.
The U.S. Fire policy offers no primary layer of coverage. Sold under the name "Comprehensive Catastrophe Liability Policy (The Defender)," it provides excess malpractice coverage of up to $10 million per occurrence. The parties agree that this coverage is intended to be in excess of the first $500,000 in liability coverage. The policy itself reveals that it is expressly limited in application to liabilities for which insurance was already afforded by an "underlying Hospital Professional Liability Policy listed in Schedule A" and the policy expressly requires the insured to warrant that underlying insurance no more restrictive than that listed in such schedule be maintained during the life of the catastrophe policy. (The Schedule A in question listed the Hartford hospital malpractice policy and indicated that such policy carried a $500,000 limit per claim.)
The U.S. Fire policy resembles the "Fire" automobile policy in LiMauro that there was found to provide senior, noncontributing coverage. Like the U.S. Fire policy, that policy offered no primary coverage at all but rather a defined layer of coverage above that provided by underlying policies and required that the underlying policies be maintained in certain specified minimum amounts. LiMauro, 65 N.Y.2d at 376-77, 492 N.Y.S.2d at 540, 482 N.E.2d at 19. In addition, the U.S. Fire policy contains an "other insurance" clause that is virtually identical in wording to the excess policy in LiMauro.[2] These "other insurance" provision, by specifically proscribing contribution to any other insurance  and identifying the policy as one excess over all other insurance"except insurance purchased to apply in excess of the sum of the [policy's] retained limit and the limit of liability," confirm the status of their coverage as excess upper tier insurance.
A policy having these attributes, while it will be deemed junior to insurance that is purchased expressly for the purpose of providing coverage above its limits, see, e.g. Lumbermens, 51 N.Y.2d at 655-56, 435 *302 N.Y.S.2d at 955, 417 N.E.2d at 67-68, stands senior to other policies that cannot fairly be said to have been written to provide such top tier coverage. See LiMauro, 65 N.Y.2d at 377-78, 492 N.Y.S.2d at 540-41, 482 N.E.2d at 19-20 (noting that wording of such a senior policy's "other insurance" clause squarely "negate[s] any intention to contribute with other policies except such as were purchased in excess over its excess insurance"). The point is to respect the fact that policies that "cover[] the same risk," often are designed to "cover[] it at different levels," id., 65 N.Y.2d at 378, 492 N.Y.S.2d at 541, 482 N.E.2d at 20.
The question thus becomes whether Argonaut's policy contains language or possesses other features of coverage that suffice to establish that it was purchased to apply in excess of the limits of a policy like that of U.S. Fire, which rather clearly sets forth the level at which it covers the risk and further provides that it does not contribute with other policies unless such insurance was "purchased to apply in excess of the sum" of its retained and liability limits.
Under the decisional law, the Argonaut policy here in question evidently does not. In Lumbermens the New York Court of Appeals determined that a policy that was of the nature of catastrophe insurance and that specifically stated that its coverage is excess to all other excess coverage should be considered to stand as excess to a U.S. Fire-like policy that provided non-primary upper tier coverage. Lumbermens, 51 N.Y.2d at 655-56, 435 N.Y.S.2d at 955, 417 N.E.2d at 67-68. In contrast to the favored policy considered in Lumbermens, in LiMauro the court examined a non-catastrophe policy containing language that simply provided that its coverage was excess to "any other valid and collectible insurance." LiMauro held such language an insufficient basis upon which to elevate that policy above one, which, like U.S. Fire's, clearly had been written to provide a specific, non-primary upper tier of coverage and which also contained language stating its coverage to be excess to all but insurance purchased specifically as excess to its own limits. 65 N.Y.2d at 377-78, 492 N.Y. S.2d at 540-41, 482 N.E.2d at 19-20. Thus, to "trump" catastrophe coverage like that provided by U.S. Fire, there must be some indication, apart from the pervasive "excess to all" insurance language, that the Argonaut policy was purchased specifically to function as coverage senior to the level of risk insured by U.S. Fire.
The Argonaut policy's "other insurance" clause stating that it covers only that liability that is "excess beyond the amount which would have been payable under ... other insurance" is by this standard insufficient to establish that such coverage is excess of the catastrophe policy of U.S. Fire.[3] It resembles the "excess to all other collectible insurance" construction of LiMauro, not the stricter "excess of all excess" language discussed in Lumbermens. Moreover, the stated coverage of the Argonaut policy does not suggest that the policy had as its purpose the provision of upper tier umbrella or catastrophe coverage. For these reasons Argonaut's policy does not appear to have been purchased to apply in excess of the quite specific nonprimary tier of insurance coverage provided under U.S. Fire's catastrophe policy  contribution from which is expressly limited to insurance written to provide coverage in excess of its limits  and so under LiMauro and Lumbermens, U.S. Fire's coverage must *303 be regarded as excess of Argonaut's own.[4]
While not relied upon in arriving at this conclusion, the result would appear to draw further support from the fact that had Argonaut truly intended to be excess of U.S. Fire, such intention might easily have been indicated in a specific fashion within the Argonaut policy at the time of its issuance. Argonaut's "drop back" policy was, after all, the subsequently reported policy. Argonaut in all likelihood had actual notice of the pre-existing U.S. Fire policy because the latter policy was cancelled by Mount Sinai relatively early into its term and the successor policy to it was issued by Argonaut. The opportunity so easily to correct the ambiguity associated with the overlapping coverage was not available to U.S. Fire, because it obviously could not have known that the insured would in the future contract for the Argonaut "drop back" policy.

Conclusion
For the reasons set forth above, U.S. Fire has no obligation to contribute to the Bilbraut settlement. The clerk is directed to dismiss Argonaut's complaint against U.S. Fire.
It is so ordered.
NOTES
[1] Hartford's policy 10CLA43200 in effect at the time of the incident contained a $50,000 limitation per occurrence. Argonaut and U.S. Fire both contended in the now settled proceedings against Hartford that Hartford's policy included an endorsement that actually obligated it to pay substantially more  $500,000 or $1,000,000  as opposed to the limit of $50,000 per occurrence. Neither Argonaut or U.S. Fire now urges, however, that the proper size of Hartford's liability limitation applicable to the Bilbraut occurrence need be determined to resolve the instant dispute.
[2] The LiMauro policy's "other insurance" clause read as follows:

"If other collectible insurance with any other insurer is available to the Insured covering a loss also covered hereunder (except insurance purchased to apply in excess of the sum of the Retained Limit  Coverage L and limit of liability hereunder), the insurance hereunder shall be in excess of, and shall not contribute with, such other insurance."
Id., 65 N.Y.2d at 376-77, 492 N.Y.S.2d at 540, 482 N.E.2d at 19.
[3] Nor does it function as an "escape" clause rather than an "excess" clause, as alternatively urged by Argonaut's counsel. Under New York law, a policy containing an unambiguous no liability/escape clause has no obligation to contribute to a liability if other insurance having only an excess clause is available. See e.g., Davis v. DeFrank, 33 A.D.2d 236, 306 N.Y.S.2d 827, 831, aff'd, 27 N.Y.2d 924, 318 N.Y.S.2d 142, 266 N.E.2d 822 (1970). The language in Argonaut's "other insurance" clause does not provide, however, as do the escape clauses recognized under New York law, that it covers a risk "only if no other valid and collectible insurance, either primary or excess" is available. See Davis v. DeFrank, 306 N.Y.S.2d at 831. Rather, it states that it covers liabilities only in respect of "any excess beyond the amount" of coverage payable from other insurance and so under Davis would not qualify.
[4] The state of the record has not allowed the court to rely upon the size of premiums under the two policies, a factor which may be relevant to determining the level of the risk because premium rates presumably correspond to the insurers' distinct expectations of being called upon to contribute to a claim. LiMauro, 65 N.Y.2d at 378, 492 N.Y.S.2d at 541, 482 N.E.2d at 20; see also Lumbermens, 51 N.Y.2d at 656, 435 N.Y.S.2d at 955, 417 N.E.2d at 68 (noting expectation that catastrophe policy premiums will reflect "rarity of [issuer's] ultimate requirement to contribute to a settlement"). While the parties indicated that Argonaut's $1,000,000 policy exacted a premium of $213,500, and U.S. Fire's $10,000,000 policy exacted a premium of $75,900, no direct comparison of those figures was warranted because the U.S. Fire policy was limited in coverage to Mount Sinai Hospital facilities while Argonaut's extended to a great number of FOJP facilities. Cf. Northbrook Excess and Surplus Insurance Co. v. Chubb Group, 113 A.D.2d 319, 325, 496 N.Y.S.2d 430, 433 (1st Dept.1985) ("In evaluating the significance of the amount of the premium, it is clearly important to measure that premium against the [comprehensiveness of the] coverage provided by that policy."), aff'd mem., 67 N.Y.2d 1015, 503 N.Y.S.2d 317, 494 N.E.2d 448 (1986).